[Cite as *State v. Deaton*, 2017-Ohio-7094.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27181 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-66 |
| | : | |
| JAMES A. DEATON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of August, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, and ANDREW T. FRENCH, Atty. Reg. No. 0069384 Assistant Prosecuting Attorneys, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
     Attorneys for Plaintiff-Appellee

NICHOLAS TESTA, Atty. Reg. No. 0087854, 555 City Park Avenue, Columbus, Ohio 43215
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, J.

**{¶ 1}** Defendant-appellant, James A. Deaton, appeals from his conviction for one count of felonious assault with a deadly weapon, a violation of R.C. 2903.11(A)(2); one count of discharge of a firearm on or near prohibited premises, a violation of R.C. 2923.162(A)(3); one count of domestic violence, a violation of R.C. 2919.25(A); one count of abduction, a violation of R.C. 2905.02(A)(2); and one count of having a weapon while under disability, a violation of R.C. 2923.13(A)(3). Raising three assignments of error, Deaton requests that his convictions be vacated. First, Deaton argues that the trial court erred by allowing a police officer to testify regarding the veracity of other witnesses' testimony. Second, he argues that he did not receive effective assistance of counsel, and third, he argues that his convictions were against the manifest weight of the evidence. We find that Deaton's assignments of error lack merit. Therefore, we affirm the judgment of the trial court.

## I. Facts and Procedural History

**{¶ 2}** On January 5, 2016, Deaton's wife met Deaton at their former martial residence on Borges Street in Clayton to retrieve a mail-order purchase that had not been forwarded to her new address. Deaton and his wife were separated at the time, and Mrs. Deaton had already initiated divorce proceedings.[1]

**{¶ 3}** Once inside the house, by Mrs. Deaton's account, Deaton escorted her to the master bedroom and handed her purchase to her. Deaton then began to lament their

---

[1] On the first day of Deaton's trial—May 16, 2016—Mrs. Deaton testified that she expected the divorce to be finalized effective May 26, 2016. Trial Tr. 111, May 16, 2016.

impending divorce, producing a revolver and positioning himself such that Mrs. Deaton could not leave the room. After convincing Deaton that they should continue talking in the living room, Mrs. Deaton indicated that she had an appointment to keep and needed to be on her way. In response, Deaton placed his revolver on her shoulder and told her that she would not be going anywhere.

{¶ 4} Deaton eventually relented, however, telling Mrs. Deaton that he would accompany her to her appointment. Seizing the opportunity when Deaton put down the revolver to pick up his coat, Mrs. Deaton left the house, stepped into her car and locked its doors. Deaton, who had followed her outside, asked Mrs. Deaton to wait in her car so that he could return a pair of her shoes. As Mrs. Deaton waited, Deaton went back into the house.

{¶ 5} When Deaton reappeared at the front door, he was holding a pink box, but he dropped the box and picked up his revolver as he emerged onto the front porch. Mrs. Deaton, who had apparently started her car's engine by this point, ducked down and heard a bullet hit the car. As she accelerated away, she heard a second gunshot and saw Deaton standing on the sidewalk in her rear-view mirror. Deaton's account of the incident varies considerably—in particular, he contends that the revolver discharged by accident—although the jury believed Mrs. Deaton and found Deaton guilty as charged on all counts.

## II. Analysis

{¶ 6} For the first of his three assignments of error, Deaton argues that:

> THE TRIAL COURT ERRED IN ALLOWING THE STATE'S POLICE
>
> OFFICER WITNESS TO TESTIFY AS TO THE TRUTH AND VERACITY

OF BOTH THE STATE'S WITNESS AND THE APPELLANT.

{¶ 7} In *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), syllabus, the Ohio Supreme Court held that "expert [witnesses] may not testify as to [their] opinion[s] of the veracity of the statements of * * * child declarant[s]."   More generally, the *Boston* rule establishes that "expert[s] may not provide [their] opinion[s] * * * regarding the truth of a[ny other] witness[es'] statements or testimony."   *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 26 (2d Dist.). citing *Boston*, 46 Ohio St.3d at 128-129.   This court also applies the *Boston* rule to police officers, "because "juror[s] [are] likely to perceive [them to be] expert[s] and because the rule applies to lay persons as well as [to] expert[] [witnesses]."   *State v. Tobin*, 2d Dist. Greene No. 2005 CA 150, 2007-Ohio-1345, ¶ 24.

{¶ 8} At Deaton's trial, the State called three officers with the Clayton Police Department as witnesses during its case in chief.   Trial Tr. 203, 210 and 224, May 16, 2017.   The third of the three officers ("Officer 3") gave the testimony to which Deaton refers in his first assignment of error.   On cross-examination, Deaton's counsel asked Officer 3 the following series of questions:

DEFENSE COUNSEL: Okay.   Did you have anything to do with processing [the victim's] vehicle * * *?

OFFICER 3: I did not.

DEFENSE COUNSEL: Okay.   While you were at the scene at the Borges Street address[,] did you take any measurements from the top of--- from the front door down to the street?

OFFICER 3: I did not take any measurements.

DEFENSE COUNSEL: Okay. Did you do any angle measurement from the top of the stair where the door was---the house down to the street?

OFFICER 3: I did not.

DEFENSE COUNSEL: Okay. Was the [victim's] vehicle sent out for processing by the Miami Valley Crime Lab or the Bureau of Criminal Identification and Investigation to determine trajectory or angle of the bullet holes that were in the vehicle?

OFFICER 3: There was no lab [analysis] that was done in regards to trajectory.

DEFENSE COUNSEL: Okay. The vehicle was processed at the scene. The door panel was taken off. The fragments were removed. Photographs were taken. And then it was released to [the victim]; is that correct?

OFFICER 3: That'd be correct.

DEFENSE COUNSEL: Okay.

Trial Tr. 235. The State then asked Officer 3 a single question on redirect:

THE STATE: [D]id you have any evidence indicating that this was an accidental shooting that would have required you to take measurements in this case?

OFFICER 3: No.

THE STATE: Nothing else, Judge.

*Id.* at 236. Because Deaton did not object to this testimony at the time, we review its admission only for plain error. *State v. Wickline*, 50 Ohio St.3d 114, 119-120, 552 N.E.2d

913 (1990), citing *State v. Broom*, 40 Ohio St.3d 277, 288-289, 533 N.E.2d 682 (1988), and *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364 (1977), paragraph one of the syllabus. Plain error "does not exist unless it can be said but for the error the outcome of the trial clearly would have been otherwise." *State v. Mundy*, 99 Ohio App.3d 275, 300, 650 N.E.2d 502 (2d Dist.1994), citing *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 (1983), and *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

{¶ 9} Deaton contends that even though Officer 3 "did not expressly say that [Mrs. Deaton] was telling the truth and [Deaton] was not, by answering the question posed by the prosecuting attorney [on redirect], [Officer 3] effectively testified that he believed the testimony of [Mrs. Deaton] and did not believe the defense theory [or] the * * * testimony" offered by Deaton himself. Appellant's Br. 8. To illustrate "how courts have viewed this type of testimony," Deaton directs our attention to *State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13, ¶ 74-83 (11th Dist.). In *Butcher*, Deaton notes, "hearsay statements of * * * alleged [minor] victim[s] of rape were admitted into evidence through the testimony of multiple [adult] witnesses," and he emphasizes that "[w]hile none of [these] witnesses specifically stated that they believed or did not believe the victim[s], the [Eleventh District Court of Appeals] nonetheless held that 'the repetition [of hearsay references to the victims' statements] ha[d] the effect of the adults['] vouching for the veracity of the statements.' " Appellant's Br. 8, quoting *Butcher*, 2007-Ohio-118, ¶ 79; *see also Butcher*, 2007-Ohio-118, ¶ 2, 6, 15-16, 23, 45-46 and 52. Deaton characterizes Officer 3's testimony as functionally equivalent to the testimony deemed impermissible by the Eleventh District. Appellant's Br. 9.

{¶ 10} We find that Deaton's reliance on *Butcher* is misplaced. Appellant Butcher

presented two assignments of error: (1) the " 'trial court erred to [his] prejudice in admitting hearsay statements which did not fall within any exception to * * * Evid.R. 802' "; and (2) he " 'was denied the effective assistance of counsel' " as the result of his attorney's failure to object to the admission of the statements. *Butcher*, 2007-Ohio-118, ¶ 19-20 and 40-41. The *Butcher* decision, then, did not implicate the *Boston* rule, but instead, the rules on hearsay set forth in Evid.R. 802-804.[2] For that matter, though the Eleventh District did refer to the "repetition" of hearsay statements, Deaton's citation to this remark omits the context. Appellant's Br. 8, quoting *Butcher*, 2007-Ohio-118, ¶ 79. The court indicated, in summary, that it could not "conclude that Butcher had a fair trial," explaining that even if, in general, "the improper admission of a single hearsay statement may be considered 'harmless' error," Butcher had been prejudiced as the result of the repetitive admission of such testimony. *Butcher*, 2007-Ohio-118, ¶ 75-76, 78-79 and 82.

{¶ 11} Here, Deaton's counsel presented the defense's theory to the jury during opening statements, telling them that "the evidence will show that Mr. Deaton [fell as he emerged from the house,] and as he fell[,] the gun went off[,] striking [Mrs. Deaton's] vehicle." Trial Tr. 107. Counsel later pursued this theory with two of the three Clayton Police Department officers testifying for the State, including Officer 3, asking both of them on cross-examination whether measurements had been taken to determine the trajectory of the bullets. *Id.* at 223 and 235. Thus, the question posed to Officer 3 by the State on redirect was a response to an issue raised by the defense, rather than an attempt to

---

[2] The *Butcher* decision includes two citations to *Boston*, both in reference to Evid.R. 803(4). *Butcher*, 2007-Ohio-118, ¶ 57, fn. 26, and 98.

bolster or to discredit a specific witness's testimony. [3]    Mrs. Deaton, in fact, acknowledged that she heard, rather than saw, a gun being fired, and at the time, Deaton had not yet taken the stand.   Trial Tr. 146-147.   Further, unlike the hearsay testimony in *Butcher*, Officer 3's assertion that he did not have evidence of an accidental discharge was the testimony of a single witness and was not repeated.

{¶ 12} Additionally, Deaton contends that our decision in *State v. Mundy*, 99 Ohio App.3d 275, 650 N.E.2d 502 (2d Dist.1994), is precisely on point.   Appellant's Br. 9.   In *Mundy*, a case involving charges of gross sexual imposition on minors, we found that two experts had "obvious[ly]" implied that statements made by the minor witnesses were truthful, notwithstanding the fact that the experts had not "expressly testified" to this effect. *Mundy*, 99 Ohio App.3d at 285 and 311-312.   The objectionable testimony in *Mundy*, however, was far more direct than the testimony at issue in this case.   For example, one of the experts in *Mundy* testified that "[t]hese are the kinds of details that children who have not been actually abused do not provide," and similarly, the other testified that "[t]he only thing I would say to you is if you know [one of the minor victims], he's not the kind of kid who can be coached, believe me."   *Id.* at 311.   Officer 3, by contrast, testified merely that he had not collected any evidence indicative of an accidental discharge.   Trial Tr. 236.

{¶ 13} This sort of implicit corroboration and contradiction is intrinsic to the adversary system; in proving its case, each side unavoidably seeks to disprove the case presented by the other.   On the record before us, we cannot conclude that the outcome of Deaton's trial would clearly have been different but for the admission of Officer 3's

---

[3] The State did not question the second officer on redirect.

testimony—or, in other words, that the admission of the testimony was plain error. Deaton's first assignment of error is overruled.

{¶ 14} For his second assignment of error, Deaton argues that:

THE APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

{¶ 15} To prevail on a claim of "ineffective assistance of counsel, a defendant must satisfy the two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *State v. Cardenas*, 2016-Ohio-5537, 61 N.E.3d 20, ¶ 38 (2d Dist.). The *Strickland* test requires a showing that: "(1) defense counsel's performance was so deficient that [it did not fulfill the right to assistance of counsel] guaranteed under the Sixth Amendment to the United States Constitution; and (2) * * * defense counsel's errors prejudiced the defendant." *Id.*, citing *Strickland*, 466 U.S. at 687. Satisfaction of the second prong of the test requires that the defendant "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A failure "to make either showing defeats" the claim. *Cardenas*, 2016-Ohio-5537, ¶ 38.

{¶ 16} Deaton faults the performance of his trial counsel in four respects. Of these, Deaton first contends that counsel should have "object[ed] to the * * * inadmissible and extremely prejudicial testimony" given by Officer 3 on redirect examination because the officer had not been qualified as an expert witness. Appellant's Br. 12-13. According to Deaton, "[b]y [implying] that there was no evidence to suggest an accident, [Officer 3] improperly testified as to his belief [regarding Deaton's] mental state during the

incident in question." *Id.* at 13. Yet, the State asked the officer only whether he had collected " 'any evidence indicating that this was an accidental shooting that would have required [him] to take measurements' " and engage in further analysis. *Id.*, quoting Trial Tr. 236. The officer need not have been qualified as an expert to describe the physical evidence—or lack thereof—collected during an investigation in which he actively participated, nor did his statement that he had no such evidence amount to an assessment of Deaton's state of mind.[4]

{¶ 17} Deaton likens his case to *State v. Huff*, 145 Ohio App.3d 555, 763 N.E.2d 695 (1st Dist.2001). In *Huff*, the appellant (Cleavon Huff) claimed that his defense counsel was ineffective for failing "to object to the [S]tate's question to [a Cincinnati Police Department officer] regarding whether identity was an issue in the case"; the officer testified that it was not. *Id.* at 561. Describing Huff's trial as "a credibility contest between the victims['] * * * identification of Huff as the shooter" on one side, and "Huff and his alibi witness" on the other, the First District Court of Appeals held that Huff's counsel should have objected to the question because the officer's opinion testimony " 'acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility.' " *Id.*, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988) (Brown, J., concurring).

{¶ 18} This comparison is unavailing. Officer 3 did not express his opinion regarding the truthfulness of either Mrs. Deaton or Deaton himself. As well, Deaton's

---

[4] Had Officer 3 answered "yes" rather than "no" to the State's question on redirect, the same conclusion would be warranted. Physical evidence of an accidental discharge might have substantiated Deaton's account of events, but it would have afforded little or no insight into his thoughts and emotions.

testimony, had the jury believed it, could have been construed as explaining the absence of physical evidence that the revolver discharged accidentally.    *See* Trial Tr. 310.

**{¶ 19}** Moreover, irrespective of whether Officer 3 qualified to testify as an expert regarding the operation of a revolver, his testimony establishes that he had sufficient familiarity with firearms to offer his opinion.   Lay witnesses, under some circumstances, are permitted "to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702."   *See State v. McKee*, 91 Ohio St.3d 292, 296, 744 N.E.2d 737 (2001).   When lay testimony of this kind is allowed, its admission is "not based on specialized knowledge within the scope of Evid.R. 702, but rather [is] based upon a layperson's personal knowledge and experience."   *Id.* at 297. Here, Officer 3 testified that he is, or was at the time, "a firearms instructor for pistols" for the Clayton Police Department, including "semi-automatic pistols, revolvers, shotguns, patrol rifle[s], and submachine guns," which demonstrates that, expert witness or not, he had sufficient personal knowledge and experience to testify regarding the operation of a revolver.

**{¶ 20}** Second, Deaton contends that his counsel should have requested a jury instruction on "accident."   *Ohio Jury Instructions*, CR Section 421.01 (Rev. Apr. 2017) defines the term "accident" as a "result * * * that occurs unintentionally and without any design or purpose to bring it about" or "a mere physical happening or event, out of the usual order of things and not reasonably [anticipated or foreseen] as a natural or probable result of a lawful act."[5]   The appended comment states that an "instruction on accident

---

[5] The 2017 revision is essentially identical to the text of the 2010 instruction.   *Compare State v. Crawford*, 2016-Ohio-7779, 73 N.E.3d 1110, ¶ 15 (8th Dist.), *with Ohio Jury Instructions*, CR Section 421.01 (Rev. Apr. 2017).

is not recommended unless required by the evidence, argument or request of counsel." *Id.* A claim of accident is not an affirmative defense. *See State v. Poole*, 33 Ohio St.2d 18, 294 N.E.2d 888 (1973), syllabus.

{¶ 21} To "be entitled to a jury instruction on accident, there must be evidence to support the argument that the [defendant] acted lawfully and that the result was unintended." *State v. Jones*, 2d Dist. Montgomery No. 20349, 2005-Ohio-1208, ¶ 21, citing *State v. Ross*, 135 Ohio App.3d 262, 276-277, 733 N.E.2d 659 (12th Dist.1999). When "accident has been raised as a defense, with a supporting record, a court errs when it refuses to charge the jury on [the] issue." *State v. Smith*, 2d Dist. Miami No. 95-CA-17, 1996 WL 239823, *8 (May 10, 1996), citing *State v. Brady*, 48 Ohio App.3d 41, 548 N.E.2d 278 (11th Dist.1988), paragraph one of the syllabus. Nevertheless, even if a "trial court err[s] in failing to provide a jury instruction on the accident defense, 'if the * * * court's general charge was otherwise correct, it is doubtful that this error of omission would ever satisfy the test for "plain error" by affecting the outcome of the trial.' " *State v. Sunderman*, 5th Dist. Stark No. 2006-CA-00321, 2008-Ohio-3465, ¶ 27, quoting *State v. Stubblefield*, 1st Dist. Hamilton No. C-890597, 1991 WL 17219, *3 (Feb. 13, 1991).

{¶ 22} The only evidence supporting Deaton's accident defense in this case was his own testimony, and the trial court correctly instructed the jury on the elements of the charges against him. *See* Trial Tr. 413-427 (jury instructions). Conceding that "a failure to request an instruction for accident is [generally] insufficient to support a claim of ineffective assistance of counsel," Deaton argues that when "developments over the course of [a] case demand that jurors be reminded that accident constitutes a defense, * * * the failure to request such an instruction does constitute ineffective assistance."

Appellant's Br. 15. Deaton relies on our holding in *State v. Jones*, 2d Dist. Montgomery No. 20349, 2005-Ohio-1208, in support of his argument. In *Jones*, the defendant (J.B. Jones, Jr.) was charged with possession of cocaine and felonious assault with a firearm. *Jones*, 2005-Ohio-1208, ¶ 1.

{¶ 23} The case is easily distinguished from the instant matter, however, because in *Jones*, the prosecutor "suggested [during closing arguments] that even if Jones did not intend to shoot his victim[,] he should still be held criminally responsible because he brought a gun into the situation, giving rise to the peril that resulted in the shooting." *Id.* at ¶ 4. Our concern with this statement was that "the jury may not have understood that accident is a defense." *Id.* at ¶ 21, citing *State v. Underdown*, 124 Ohio App.3d 675, 681, 707 N.E.2d 519 (10th Dist. 1997). Here, by contrast, the State repeatedly referred to Deaton's accident defense in closing and urged the jury to reject it. Trial Tr. 362-368, 384, 386, 390-392, 399-409. We see nothing in the record of Deaton's trial suggesting that the jury did not understand that accident was a defense.

{¶ 24} Third, Deaton blames his trial counsel for ill-advisedly asking him "a series of questions which opened the door to otherwise inadmissible testimony [regarding a] prior conviction." Appellant's Br. 18. Specifically, Deaton refers to the following exchange, during which Deaton was explaining his interaction with Mrs. Deaton in the master bedroom:

DEFENSE COUNSEL: Okay. But why did you pick the gun up? Why not just leave it there?

DEATON: It's just because---the more I wanted to turn around and I wanted to get---I can't have a gun[,] so I can't touch a gun or anything like

that, so I was, like---and she has a concealed and carry[,] so I'm not allowed to have one[,] so I was like, well, hey, is this yours or, you know---

DEFENSE COUNSEL: Okay. And you say you're not allowed to have a gun.

DEATON: Yes, sir.

DEFENSE COUNSEL: Why is that?

DEATON: In 2003 there was a conspiracy for contribute marijuana [sic] and I knew about it[,] so I got charged.

DEFENSE COUNSEL: Okay. You have a conviction for that?

DEATON: Yes, sir.

DEFENSE COUNSEL: Okay. And because of that you are not allowed to own, purchase, posses[s], [or] use a firearm; is that fair?

DEATON: That's correct, sir.

DEFENSE COUNSEL: Okay. Which gets me back to why did you pick the gun up[,] then?

DEATON: I didn't know. I learned after going through all this that once you're under weapons under disability you're not allowed a gun store [sic], touch a gun, anything like that. So I always thought it was possession, like, if you would buy a gun, carry it on you, or something like that, but that's what weapons under disability meant.

DEFENSE COUNSEL: Okay. So when you picked it up[,] what was your intention?

DEATON: To get rid of it. I---I couldn't have it. * * *.

Trial Tr. 292-293.   In Deaton's opinion, "[t]his is made more troubling by the fact that [he] executed a jury waiver as to the charge of weapons under disability with the strategy of keeping [his] prior conviction from contemplation by the jury."   Appellant's Br. 18.

{¶ 25} A "reviewing court may not second-guess decisions of counsel [that] can be considered matters of trial strategy."   *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).   Even if, "in hindsight, it looks as if a better strategy had been available," debatable "strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel."   *Id.*, citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992). Although the foregoing line of questioning might have defeated the purpose of executing a jury waiver on the charge of having a weapon while under disability, Deaton's defense pivoted on his contention that the revolver discharged accidentally, and he denied that he ever pointed the revolver at Mrs. Deaton or threatened her with it.   Trial Tr. 294.   This defense begs the question of how he ever came to be holding the revolver in the first place, which Deaton's counsel seems to have recognized.   Whether counsel would have been better advised to curtail his questioning of Deaton on this point is therefore immaterial—Deaton needed to explain to the jury why he had ever picked up the revolver at all.

{¶ 26} We find that Deaton's counsel did not fail to render adequate assistance by choosing not to object to Officer 3's testimony, by declining to request a jury instruction on accident or by asking Deaton to explain why he picked up the revolver.   Even assuming that one or more of these decisions could be characterized as an error, we see little reason to conclude that the result of Deaton's trial would otherwise have been

different: Deaton's only evidence that the revolver discharged accidentally was his own testimony; an instruction on accident was simply unnecessary in this instance; and to perfect his accident defense, Deaton could not avoid accounting for the fact that he somehow came to be holding a gun.

{¶ 27} Finally, Deaton argues that even if none of the three specific items for which he faults his counsel's performance is "sufficient to warrant reversal," the "cumulative [effect of the purported] errors deprived him of a fair trial and certainly undermine[s] confidence in the outcome of the case." Appellant's Br. 22. This argument is unpersuasive because, as we have found, counsel's performance was not deficient in any of these respects. Therefore, Deaton's second assignment of error is overruled.

{¶ 28} For his third assignment of error, Deaton argues that:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 29} On a claim that a jury verdict is against the manifest weight of the evidence, an "appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Cochran*, 2d Dist. Montgomery No. 27023, 2017-Ohio-216, ¶ 5, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Although an appellate court "must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses," the court nevertheless "may determine which of several competing inferences suggested by the evidence should be preferred." (Citation

omitted.) *Id.* A conviction "should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." (Citation omitted.) *Id.*

**{¶ 30}** Deaton argues that his conviction should be vacated pursuant to this standard as the result of inconsistencies between Mrs. Deaton's written statement to the police and her trial testimony, along with the admission of Officer 3's opinion testimony. Appellant's Br. 23-24. Put simply, Deaton "contends that, when viewed as a whole, [his] testimony is more credible than that of the State's witness[es]." *Id.* at 24.

**{¶ 31}** At Deaton's trial, his attorney cross-examined Mrs. Deaton about the putative inconsistencies between her written statement to police and her in-court testimony. After showing Mrs. Deaton a copy of her written statement, counsel questioned her as follows:

> DEFENSE COUNSEL: Okay. After reviewing that statement[,] does it refresh your recollection about what you told them happened?
>
> MRS. DEATON: [referring to the testimony she had given at that point in the trial] I think it's saying the same thing. It's just a shorter version.
>
> DEFENSE COUNSEL: Okay. But you indicated in that statement that "[h]e picked up the gun, ran out of the house with the gun aimed at me, [so] I put the car in drive and sped off." Is that right?
>
> MRS. DEATON: That's the short version, yes.
>
> DEFENSE COUNSEL: Okay. Al[right]. And this was a statement that you gave them back on January the 5th?
>
> MRS. DEATON: Yes.

Trial Tr. 194-195. Earlier in the trial, the State had asked her to describe the same

sequence of events:

THE STATE: Okay. So the [d]efendant comes out of the master bedroom with that shoebox in his hands. What happens at that point?

MRS. DEATON: At that point in like one swift motion he picked up the gun, dropped the box, pulled the gun up and was out the door.

\* \* \*

THE STATE: So now you said that the [d]efendant has dropped this shoebox—the pink shoebox—and is coming out the front door[,] and he has the gun in this [sic] hand. What happens at that point, [Mrs. Deaton]?

MRS. DEATON: He raised [the revolver,] and the look on his face was nothing I'll ever forget. It was that I betrayed him and he meant it, like, he was mad because basically I was in the car and I wasn't getting out and he knew this was it because I wasn't coming back. And so when he drew the gun up[,] I looked at this face and then I just ducked down in the seat and he pulled the trigger.

\* \* \*

THE STATE: Okay. And what did you hear when he pulled the trigger?

MRS. DEATON: I heard it hit the car.

THE STATE: Hit your car?

MRS. DEATON: Yes.

THE STATE: Okay. And you didn't see this, did you?

MRS. DEATON: No, because when he raised the gun here and I

saw his face[,] I saw him step down and I ducked because I thought he was going to come to the car.

*Id.* at 145-147.

{¶ 32} Despite the subtle differences between the statement Mrs. Deaton gave to police on January 5, 2016 and her testimony at trial, any such inconsistency does not appear so significant as to cast serious doubt on Mrs. Deaton's truthfulness. She describes essentially the same sequence of events, though her trial testimony provided more precise detail. By comparison, Deaton's account of how the revolver twice discharged accidentally appears disjointed and contrived:

DEFENSE COUNSEL: Okay. How long from the time you left the side of her vehicle to go back inside and get the shoes and then come back out[side]---how long did that take you?

DEATON: Couple of minutes. She asked me to hurry because---

DEFENSE COUNSEL: Couple of minutes---I mean, that's a long time.

DEATON: Yeah, well, I don't have---I was in a hurry so, I mean, a minute or so maybe.

DEFENSE COUNSEL: Okay.

DEATON: Because I still---like I said, I had to go through the house, up the stairs, and then get on the ladder to get up into---to get the shoes.

DEFENSE COUNSEL: Al[right]. So you come back out of the master bedroom through the living room---

DEATON: Yes, sir.

DEFENSE COUNSEL: ---to the front door?

DEATON: Yes, sir.

DEFENSE COUNSEL: And then what did you do?

DEATON: I came down to the bottom of the steps.

DEFENSE COUNSEL: Okay.   You have the shoes with you?

DEATON: Yes, sir.

DEFENSE COUNSEL: You have the gun with you?

DEATON: Yes, sir.

DEFENSE COUNSEL: And where is [Mrs. Deaton] at this time?

DEATON: In [her] car.

* * *

DEFENSE COUNSEL: Okay.   And then what happened as you got down the steps?

DEATON: I fell.

DEFENSE COUNSEL: Okay.   And then what happened?

DEATON: Then the gun---I dropped the shoes[,] and the gun went off.

* * *

DEFENSE COUNSEL: And when you fell what happened?

DEATON: I dropped the shoes and I was worried about shooting myself so---and when I went down the gun automatically went off.   It was, like, a---when I knee---if you've ever torn a [sic] ACL or anything like that, * * * it's like getting shot.   It---it's very painful.

DEFENSE COUNSEL: Okay.   Did you go down to the ground?

DEATON: Yes, sir.

DEFENSE COUNSEL: And when the---and the gun went off?

DEATON: Yes, sir.

DEFENSE COUNSEL: How many times?

DEATON: Twice.

DEFENSE COUNSEL: How close to each other?

DEATON: Within seconds.   It wasn't---what it takes to fall.   It went off as soon as I went down and I started to---to try to catch myself.   I dropped the shoes and went like this to try to catch myself.   The gun went off and then I hit my shoulder and I went like that and then the gun went off again.

*Id.* at 307-310.

{¶ 33} We find accordingly that, in weighing the credibility of Mrs. Deaton's testimony in comparison to that of Deaton, the jury did not clearly lose its way.   Deaton admitted that the revolver discharged twice while he was holding it, and the State presented testimony and physical evidence showing that two bullets struck Mrs. Deaton's car, as well as testimony from Deaton himself and Mrs. Deaton establishing that Deaton felt frustrated and depressed about the end of their marriage.   Hence, the jury could draw one of two inferences from the totality of the evidence: (1) that Deaton, overcome by his negative emotions in response to the impending divorce, fired the two shots that struck Mrs. Deaton's vehicle; or (2) that Deaton told the truth when he testified that the revolver had discharged by accident.   We cannot conclude that the jury clearly lost its way in

deciding that Mrs. Deaton's testimony was more credible than Deaton's, and we have already determined that the admission of Officer 3's testimony was not improper. Deaton's third assignment of error is overruled.

### III. Conclusion

{¶ 34} We find that none of Deaton's three assignments of error has merit. Therefore, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. concurs.

DONOVAN, J., concurring in judgment only.

Copies mailed to:

Mathias H. Heck, Jr.
Lynne R. Nothstine
Andrew T. French
Nicholas Testa
Hon. Gregory F. Singer