[Cite as *State v. Deaton*, 2020-Ohio-6955.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28735 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-66 |
| | : | |
| JAMES A. DEATON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of December, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JOHN D. SMITH, Atty. Reg. No. 0018138 and ANDREW P. MEIER, Atty. Reg. No. 0083343, 140 North Main Street, Suite B, Springboro, Ohio 45066
      Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, James A. Deaton, appeals from the judgment of the Montgomery County Court of Common Pleas overruling his petition for post-conviction relief, wherein Deaton raised a claim of ineffective assistance of counsel. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} In 2016, a jury found Deaton guilty of felonious assault with a deadly weapon, discharging a firearm on or near a prohibited premises, domestic violence, abduction, and two firearm specifications. Following a bench trial, the trial court also found Deaton guilty of having weapons while under disability. After merging some of these offenses at sentencing, the trial court sentenced Deaton to an aggregate term of 15 years in prison.

{¶ 3} Deaton's conviction resulted from an encounter with his estranged wife at their former marital residence. It was undisputed that during the encounter, Deaton was in possession of a loaded revolver that discharged twice after he exited the front of the residence. It was also undisputed that both of the bullets that discharged from the revolver struck his wife's vehicle while his wife was seated inside. The factual disputes at trial were how Deaton came to possess the revolver and whether, as asserted by Deaton, the revolver discharged accidentally. The jury ultimately resolved these factual disputes against Deaton and found him guilty of all the aforementioned offenses. Deaton then appealed from his conviction.

{¶ 4} On appeal, Deaton raised three assignments of error that challenged certain trial testimony, the effectiveness of his trial counsel, and whether his convictions were against the manifest weight of the evidence. After reviewing the matter, we overruled

Deaton's assigned errors and affirmed his conviction.  *See State v. Deaton*, 2d Dist. Montgomery No. 27181, 2017-Ohio-7094.

{¶ 5} Following our decision, Deaton filed a pro se petition for post-conviction relief under R.C. 2953.21.   In the petition, Deaton asserted that his trial counsel provided ineffective assistance by failing to retain and call an expert witness to support his claim that the firearm had discharged accidentally.   In support of his petition, Deaton attached two expert affidavits.   The affidavits were prepared by George Kidd, a firearms instructor, and John Nixon, a forensic engineer who specializes in firearms and ballistics.

{¶ 6} In Kidd's affidavit, Kidd averred to viewing a photograph from which he concluded "that the shot was fired from a near level position."   Kidd also briefly concluded that the "shot fired accidentally."   In making these conclusions, Kidd did not indicate which of the two shots he was referring to, nor did Kidd specify a specific photograph on which his conclusions were based.

{¶ 7} In Nixon's affidavit, Nixon averred to reviewing photographs of the bullet damage to the wife's vehicle and a diagram of the residence where the shooting incident occurred.   Nixon noted that the photographs depicted bullet damage to: (1) the front, driver-side door "a few inches behind the rearview mirror and close to the widow glass"; and (2) the "fuel filler flap" located at the "rear driver's side of [the] vehicle."   Based on the photographs, Nixon concluded that the bullet strike to the fuel filler flap was a horizontal graze, which indicated the firearm was "at approximately the same height as the damage when the bullet was fired."

{¶ 8} Unlike the fuel filler flap damage, Nixon could not make any conclusion about the height of the firearm with regard to the bullet strike on the vehicle's driver-side door.

Nixon averred that it would be possible to estimate the firearm's height at the time of discharge if he were able to analyze the internal damage to the vehicle's door and the angle of the door panel at the point of impact. Nixon was able, however, to conclude that the bullet struck the driver-side door "after being fired from a location approximately normal to that door rather than at an oblique angle, as [was] the case with the fuel filler flap damage." Nevertheless, Nixon also averred that "[a]n accurate shooter location may never be known[.]"

{¶ 9} In an amended petition, Deaton asserted that the information in Kidd and Nixon's affidavits indicated that the firearm discharged at ground level. Deaton argued that this information refuted his wife's trial testimony indicating that he purposely fired at her while he was stepping onto their elevated front porch. As a result, Deaton claimed that his trial counsel was ineffective in failing to retain and call experts like Kidd and Nixon at trial in order to support his claim that the firearm had discharged accidentally due to him falling at the bottom of the porch stairs near the sidewalk at ground level.

{¶ 10} When initially ruling on Deaton's petition, the trial court did not consider Kidd's and Nixon's affidavits because the court found that it lacked jurisdiction over the matter due to the petition's being filed out of time. The trial court also found that the ineffective assistance claim raised in the petition was barred by res judicata. The trial court therefore dismissed Deaton's petition and Deaton appealed from that decision.

{¶ 11} On appeal, this court found that the trial court had erroneously determined that Deaton's petition was filed out of time. We also found that res judicata did not bar the ineffective assistance claim raised in Deaton's petition since the claim was based on evidence outside the record. As a result, we reversed the trial court's judgment denying

Deaton's petition for post-conviction relief and remanded the matter back to the trial court so that the court could consider the petition on its merits. *See State v. Deaton*, 2d Dist. Montgomery No. 28120, 2019-Ohio-2128.

{¶ 12} On remand, the trial court held an evidentiary hearing on Deaton's petition. At the hearing, Deaton called Nixon, who testified regarding the conclusions in his affidavit. Nixon testified that since preparing his affidavit, he had reviewed additional photographic evidence from the State and visited the scene of the shooting. During his testimony, Nixon reiterated the information in his affidavit regarding the two areas of bullet damage to the vehicle. Nixon further added his opinion that the damage to the front, driver-side door happened first. Nixon also corrected a portion of his affidavit wherein he stated that the front porch in question had three brick steps, as Nixon explained that the porch actually only had two brick steps leading from the front door down to the front porch.

{¶ 13} With regard to the fuel filler flap damage, Nixon again reiterated the information in his affidavit, noting that the bullet damage was a horizontal graze that was parallel to the ground. Nixon testified that this indicated the muzzle of the firearm was approximately the same height as the damage to the fuel filler flap at the time the firearm discharged. In other words, Nixon testified that the shot at the fuel filler flap was fired at or near ground level.

{¶ 14} Nixon also explained the portion of his affidavit that discussed the bullet damage to the vehicle's front, driver-side door. Nixon testified that when he averred that the bullet was "fired from a location approximately normal to that door," the term "normal" meant that the bullet hit the door straight on at a 90-degree angle. Nixon testified that

he reached this conclusion because the photographs showed that the door was punctured by the bullet with the bullet going inside the door and impacting something in the material of the door. Therefore, according to Nixon, the bullet damage was not a grazing strike like on the fuel filler flap.

{¶ 15} As in his affidavit, Nixon further testified that he did not know at what height the firearm was discharged, but noted that he could calculate the height upon further analysis. Specifically, Nixon testified that if he knew the location form which the bullet had been retrieved inside the vehicle's door, he could use probes to measure the trajectory of the bullet and then determine whether the shot was fired at an upward or downward angle from the ground.

{¶ 16} After taking the matter under advisement, the trial court overruled Deaton's petition for post-conviction relief. In so holding, the trial court found that the failure of Deaton's trial counsel to obtain and call an expert witness like Nixon at trial did not fall below an objective standard of reasonable representation. The trial court reached this conclusion upon finding that there was no material conflict in the trial testimony concerning where Deaton was located when the firearm discharged. The trial court found that based on the information counsel was working with at the time of trial, counsel would not have been alerted to an issue requiring an expert such as Nixon. In other words, the trial court indicated that it would have been reasonable for counsel to believe that the expert opinion at issue would not have been helpful to Deaton's case.

{¶ 17} The trial court further concluded that Deaton failed to establish that any prejudice resulted from his counsel's failure to procure an expert witness because Deaton had not demonstrated that there was a reasonable probability that the outcome of his trial

would have been different but for the failure. The trial court noted that Deaton's expert did not provide persuasive evidence that the shooting was accidental. Therefore, the trial court concluded that Deaton had not met his burden to establish the ineffective assistance claim in his petition for post-conviction relief, and it overruled the petition. Deaton now appeals from that decision, raising a single assignment of error for review.

## Assignment of Error

{¶ 18} Under his sole assignment of error, Deaton contends that the trial court's findings in support of its decision overruling his petition for post-conviction relief were unsupported by the record. Specifically, Deaton claims that the record did not support the trial court's finding that there was no material conflict in the trial testimony concerning where he was located when the firearm discharged. Because Deaton maintains that there was such a conflict, he claims that his trial counsel should have obtained a firearms and ballistics expert such as Nixon to investigate the matter and testify in his defense. Deaton claims that his trial counsel's failure to do so amounted to ineffective assistance of counsel and that his petition for post-conviction relief should have been granted on that basis. We disagree.

{¶ 19} A trial court's decision to grant or deny a petition for post-conviction relief should be upheld absent an abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58; *State v. Greathouse*, 2d Dist. Montgomery No. 24084, 2011-Ohio-4012, ¶ 9. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "Abuse-of-

discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." (Citation omitted.) *Id.* "[W]hen a trial court rules on a petition for post-conviction relief after a hearing, an appellate court will give deference to the trial court's findings of fact." (Citation omitted.) *Gondor* at ¶ 47; *State v. Curtis*, 2d Dist. Greene No. 2008-CA-22, 2008-Ohio-5643, ¶ 23. "A reviewing court should not overrule the trial court's finding on a petition for post[-]conviction relief that is supported by competent and credible evidence." *Gondor* at ¶ 58.

{¶ 20} As previously noted, Deaton's petition for post-conviction relief asserted an ineffective assistance of counsel claim based on trial counsel's failure to obtain a firearms and ballistics expert for trial. To establish ineffective assistance, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992). "Trial counsel is also entitled to a strong presumption that his or her conduct fell within the wide range of reasonable assistance." *State v. Cooper*, 2d Dist. Montgomery No. 28181, 2019-Ohio-3919, ¶ 15, citing *Strickland* at 689.

{¶ 21} Here, the trial court overruled Deaton's petition for post-conviction relief in

part because it concluded that his trial counsel's failure to obtain a firearms and ballistics expert did not fall below an objective standard of reasonable representation. The trial court reached this conclusion upon finding that Nixon's opinion regarding where Deaton was located when the firearm discharged would not have been something counsel would have found necessary to pursue since the record indicated that there was no material dispute on that issue at trial.

{¶ 22} In so holding, the trial court explained that the residence in question had a front porch with two brick steps leading from the front door down to the front porch and a series of concrete steps below the front porch leading down to the sidewalk at ground level. The trial court found that Deaton testified at trial that he fell at the bottom of the brick steps as he was coming onto the front porch and that this testimony was similar to his wife's in that she testified to seeing Deaton hold up a firearm as he exited the front door. The trial court further found that Deaton's wife also testified to ducking for cover upon seeing Deaton hold up the firearm and to hearing the firearm discharge and hit her vehicle immediately after she ducked. In addition, the trial court found that because Deaton's wife heard the bullet hit her driver-side door almost instantly after ducking, it could be inferred from her testimony that Deaton was on the front porch when the shot was fired.

{¶ 23} Deaton, however, claims that the record does not support the trial court's findings. According to Deaton, the record indicates that there was a material conflict in the trial testimony with regard to where he was located when the firearm discharged. The relevant trial testimony from Deaton and his wife is shown below:

*Wife's Trial Testimony:*

Q. So now you said that the Defendant has dropped his shoe box – the pink shoe box – and is coming out the front door and he has the gun in this hand. What happens at that point, Misty?

A. He raised it and the look on his face was nothing I'll ever forget. * * * And so when he drew the gun up I looked at his face and then I just ducked down in the seat and he pulled the trigger.

Q. Okay. And you say he pulled the trigger. What did you hear, what did you see at that point?

A. He had – there was, like several brick steps and he had stepped down onto one step.

Q. I'm going to display real quickly, Misty, State's 21. Are these the steps you're talking about?

A. ***No. It's actually on the brick.***

* * *

Q. Okay.

A. There was one step – when I saw him pull the gun up he was in the doorway. ***Then when he shot it he was on the second step.***

Q. Okay. And what did you hear when he pulled the trigger?

A. I heard it hit the car.

* * *

Q. And you didn't see this, did you?

A. ***No because when he raised the gun here and I saw his face I saw him step down and I ducked because I thought he was***

***going to come to the car.***

\* \* \*

Q.  What happens at that point, Misty?

A.  Once he fired the gun I then – because I had the car started already – I just put the car in drive and just floored it.  ***Then I heard another shot and that's the one that hit my gas cap and I saw him standing on the sidewalk.***

Q.  You say you saw him standing on the sidewalk.   You're talking about the Defendant?

A.  Yes, I saw Jim standing on the sidewalk.

(Emphasis added.)   Trial Trans. p. 145-148.

<u>*Deaton's Trial Testimony*</u>:

Q.  Okay. You heard Misty's testimony yesterday that she says you came out of the house and stood in the doorway –

A.  Yes, sir.

Q.  -- and I think stepped down onto the first step on the brick --

A.  Yes, sir.

Q.  -- and aimed the gun and shot it at her.   Did you hear her testimony in regard to that?

A.  Yes, sir.

Q.  Is that accurate?

A.  No, sir.

Q.  Okay. What happened then once you fell down at the – where were

you when you fell?

A. ***At the bottom of the brick steps down here.***

Q. If I show you what I've marked as Exhibit B, where did you fall? Okay?

A. ***It was on the concrete.***

(Emphasis added.) Trial Trans. p. 309-310.

Q. All right. And you say you trip and fall at the bottom of the steps; is that correct?

A. Yes, sir.

Q. ***Okay. * * * are you falling forwards or straight to the ground.***

A. ***Forward.***

Q. Okay. Are you all the way on the ground yet when the gun goes off the first time, or are you still in the process of falling?

A. No, sir, process.

Q. Process. Any part of your body touching the ground at that point?

A. No, sir.

Q. Okay. So you'd be falling kind of like this?

A. Uh-huh.

Q. Agree with me you're going downwards, correct?

A. Yes, sir.

Q. ***And you're on the sidewalk?***

A. ***Yes, sir.***

* * *

Q.    So you're falling downwards the gun goes off –

A.    Yes, sir.

Q.    -- hits her driver's door?

A.    Yes, sir.

Q.    ***Okay. Then you're actually are on the ground for the second shot; is that correct?***

A.    ***Yes, sir.***

(Emphasis added.)   Trial Trans. p. 341-342.

**{¶ 24}** Upon reviewing Deaton's trial testimony, we find it reasonable to interpret it as saying that he fell at the bottom of the brick steps located on the front porch and that his firearm discharged for the first time while he was in the process of falling.   We note that when describing the fall, Deaton testified that he fell "on the concrete."   Because there is no dispute that the front porch is made of concrete, it would be reasonable to assume from Deaton's testimony that Deaton initially fell at porch level.

**{¶ 25}** It would also be reasonable to interpret Deaton's testimony as saying that he fell forward/downward toward the sidewalk, where the second shot discharged as he hit the ground.   Therefore, when considering Deaton's testimony as a whole, it would be reasonable to interpret it as Deaton's saying that the first shot was fired as he was falling forward at porch level and that upon falling forward he landed on the ground near the sidewalk when the second shot discharged.

**{¶ 26}** Based on this testimony, we find that it was reasonable for the trial court to find that Deaton's testimony concerning where he was located when the firearm discharged was not in material conflict with that of his wife.   The testimony of Deaton's

wife indicates that Deaton fired the first shot as he was coming down the brick steps onto the front porch and that the second shot was fired seconds later, after which Deaton's wife saw Deaton standing on the sidewalk. In other words, the testimony of both Deaton and his wife can be interpreted as indicating that the first shot occurred somewhere at the porch level and that the second shot occurred at or near the sidewalk at ground level. Thus, we find there was competent, credible evidence in the record to support the trial court's finding that there was no material conflict in the testimony concerning where Deaton was located when the firearm discharged.

{¶ 27} Because there was competent, credible evidence in the record supporting the trial court's no-material-conflict finding, it was reasonable for the trial court to conclude that counsel's failure to obtain the expert opinion at issue did not amount to ineffective assistance. The trial court reasonably concluded that, based on the information counsel was working with at the time of trial, counsel would not have been alerted to an issue requiring an expert to determine where Deaton was located at the time the firearm discharged. In any event, the decision whether to call an expert witness is a matter of trial strategy, and "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing *State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987); *State v. Herron*, 2d Dist. Montgomery No. 28146, 2019-Ohio-3292, ¶ 59.

{¶ 28} In so holding, we note that Deaton filed a motion to supplement the record on appeal with a video of his trial testimony. According to Deaton, the trial video shows him referencing a projected image of his front porch in an effort to indicate where he fell.

In doing so, Deaton claims that the video shows him highlighting the concrete area further down from the porch closer to where his wife's car was parked, not the brick steps. He claims this video evidence refutes the trial court's finding that there was no material conflict in the trial testimony.

{¶ 29} Despite Deaton's claims, it is well established that "[a]ppellate review is limited to the record as it existed at the time the trial court rendered judgment." *Fifth Third Mtge. Co. v. Salahuddin*, 10th Dist. Franklin No. 13AP-945, 2014-Ohio-3304, ¶ 13. An appellate court "cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus; *Eldridge v. Eldridge*, 2d Dist. Greene No. 2018-CA-17, 2019-Ohio-233, ¶ 39. Here, there is no dispute that the trial court did not consider the trial video when ruling on Deaton's petition for post-conviction relief, as the video was not entered into evidence at the evidentiary hearing on the petition. Therefore, because we cannot add matter to the record, Deaton's motion to supplement the record with the trial video is denied.

{¶ 30} That said, even if we granted Deaton's motion to supplement the record and reviewed the trial video, and even if the trial video showed what Deaton claims, the record still indicates that Deaton failed to establish that there was a reasonable probability that the outcome of his trial would have been different had his counsel retained a firearms and ballistics expert such as Nixon, because Nixon's expert opinion did not provide a conclusion as to where the first shot was discharged. Nixon merely concluded that the bullet from the first shot struck the driver-side door straight on at a 90-degree angle. Nixon testified that without further analysis, he could not determine at what height the

firearm was discharged, i.e., whether Deaton fired it at ground level or from a higher elevation like the front porch. Nixon, in fact, averred in his affidavit that "[a]n accurate shooter location may never be known[.]" Therefore, it is pure speculation as to whether a further analysis by Nixon would have supported Deaton's claim that he fell down at ground level when the first shot was fired.

{¶ 31} Moreover, even if Nixon's analysis were to show that the first shot was fired at ground level, it is also speculative as to whether that information would have affected the jury's guilty verdict, because whether or not the shot was fired at ground level would not necessarily establish that shot was fired accidentally; it only would establish the location of the firearm when it was discharged. The same is true for the second shot at the fuel filler flap, as the trial testimony and Nixon's expert opinion both indicated that the second shot was fired at ground level. Given that information, the jury could have simply found that Deaton ran down the stairs to the sidewalk as he fired the second shot at his wife's vehicle.

{¶ 32} For the foregoing reasons, one can only speculate as to what effect Nixon's expert opinion may have had on the jury's verdict, "and speculation cannot establish a reasonable probability that the outcome of the trial would have been different." *State v. Combs*, 2d Dist. Montgomery No. 22712, 2009-Ohio-1943, ¶ 16, citing *State v. Madrigal*, 87 Ohio St.3d 378, 390-392, 721 N.E.2d 52 (2000). Therefore, the trial court did not abuse its discretion in finding that the ineffective assistance of counsel claim raised in Deaton's petition for post-conviction relief lacked merit. Based on the record before this court, Deaton not only failed to establish that his trial counsel was deficient in failing to obtain an expert, but he also failed to show that the outcome of his trial would have been

different had an expert been obtained.

{¶ 33} Because the trial court did not abuse its discretion in denying Deaton's petition for post-conviction relief, Deaton's sole assignment of error is overruled.

## Conclusion

{¶ 34} Having overruled Deaton's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., concurs:

{¶ 35} I wholly agree with and join in Judge Welbaum's analysis and opinion. I write separately to detail three additional reasons why the judgment of the trial court denying the petition for post-conviction relief should be affirmed.

{¶ 36} First, as indicated by the trial court, the issue at trial was whether Deaton fired the weapon, twice, accidentally or whether he did it knowingly. John Nixon offered no opinion that the gunshots were fired accidentally.

{¶ 37} Second, a reasonable trial tactic does not support ineffective assistance of counsel. We have previously said:

> A decision "not to call a [particular] witness," for example, "is afforded a presumption of reasonableness," and to overcome the presumption, a party seeking reversal of a conviction on the basis of ineffective assistance

of counsel "must establish that the testimony of [that] witness would have significantly assisted the defense and that the testimony would have affected the outcome of the case." *State v. Ramirez*, 12th Dist. Clermont No. CA2004-06-046, 2005-Ohio-2662, ¶ 39; *State v. Jones*, 12th Dist. Butler No. CA2001-03-056, 2002-Ohio-5505, ¶ 22.

*State v. Thomson*, 2d Dist. Clark No. 2018-CA-135, 2020-Ohio-600, ¶ 11.

{¶ 38} Deaton's argument in his post-conviction relief petition was that expert opinion would have supported his testimony that he was not up on the porch for the first shot and was not standing on the sidewalk for the second shot. He claims that he was falling or had fallen to the ground when the shots were fired, and that expert testimony about the height from which the gunshots were fired would have corroborated his accidental-firing testimony. But Nixon did not offer any opinion about the height from which the first shot was fired. "I don't know what height that [first shot] would have been fired from without doing further analysis." (Post-conviction Trans. p. 63-64.) That further analysis would have depended upon finding the car, taking the door apart in hope to find that the bullet, which had been found inside the door, had struck and marked the inside panel of the door, a mark which was not visible from inside the car, and then estimating the trajectory of the bullet from connecting the now-repaired bullet hole and a mark on the inside panel. Such speculation that something might be found, or if found might be consistent with Deaton's testimony, did not support a finding of ineffective assistance of counsel.

{¶ 39} Nixon's testimony about the trajectory of the second bullet more likely would be damaging to Deaton's cause rather than helpful. Deaton testified that "[t]he gun went

off and then I hit my shoulder and I went like that and then the gun went off again." (Trial Trans. p. 310.) He claimed that at the time of the second shot he was on the sidewalk. "Q. Then you're actually are on the ground for the second shot; is that correct? A. Yes, sir." (*Id.* at 342.) "Q. So when that second shot was fired you were on the ground, correct? A. Yes, sir." (*Id.* at 344.)

{¶ 40} Nixon's opinion about the second shot, the one that hit the gas flap, was contrary to Deaton's testimony. Nixon's measurements revealed the curb "was five inches" high (Post-conviction Trans., p. 38.), making the road "five inches below the sidewalk level." (*Id.* at 39.) "The horizontal appearance of the damage [to the gas flap] indicates the gun was at approximately the same height as damage when the bullet was fired? A. That's correct." "Q. Is that another way of saying that it was parallel to the ground level when fired? A. Yes." (*Id.* at 54-55.) "[T]he gun itself would've been horizontal so that the bullet was launched in a horizontal way." (*Id.* at 56.) Nixon estimated the gas cap damage on the vehicle, an SUV, was at a height of "three feet-three inches plus or minus three inches." (*Id.* at 57.) Assuming Nixon's estimate were correct, subtracting the five-inch height of the sidewalk (the car was in the road), the gas flap damage was between 25 and 31 inches above the sidewalk. But Deaton claims he had fallen to the ground and his shoulder was on the sidewalk. The second shot, pointed at the fleeing vehicle, could not have been fired in a horizontal manner from a position parallel to the level of the gas cap if his shoulder were on the ground. Therefore, Nixon's opinion was inconsistent with Deaton's testimony and likely would have damaged Deaton's credibility.

{¶ 41} More damage would have resulted from Nixon's testimony. There was no dispute that the weapon in this case was a revolver, a weapon that can be fired in single

action, by cocking the hammer then pulling the trigger, or double action, by only pulling the trigger which both cocks and then releases the hammer. There is no evidence whatsoever that Deaton, while falling, manually cocked the weapon for single action use. It would not make sense to claim that someone manually cocked and then fired a revolver, twice, accidentally. So double action firing is apparent. Nixon testified that the force necessary to fire a double action revolver is "typically 10 to 12 pounds." (Id. 62). Ten to 12 pounds of trigger finger force is not likely to happen accidentally. Accordingly, even if Deaton's trial counsel had had Nixon's opinions available, it would have been reasonable not to call such a witness, who would only have contravened or damaged Deaton's story.

{¶ 42} Third, and perhaps most striking, Deaton's story is absurd on its face. Therefore, inconsistent, debatable or incomplete expert testimony would not change the result.   The first bullet, which struck his wife's car just below the driver's door window while she was sitting in the driver's seat, missed a direct hit at her by just inches. Out of all the directions and elevations an accidental bullet could go, it would have been an extraordinary coincidence that an accidental shot would have been so close to the mark. The second gas-flap shot, according to Nixon, was from behind and to the left of the driver's side of the vehicle at "an oblique angle, and that's typically defined as 45 degrees or less." (*Id.* at 32.) That would mean that the gun was pointed right in the direction of his wife, now a fleeing and moving target, when the second shot was fired. Out of all the directions and elevations an accidental bullet could have gone, a second accidental shot so close on target also would have been an extraordinary coincidence. The combination of two extraordinary coincidences happening to the same person, seconds apart, makes the chances they were both accidental astronomical. The expert testimony Deaton offered

at the post-conviction hearing wouldn't change that.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
John D. Smith
Andrew P. Meier
Hon. Timothy N. O'Connell