[Cite as *State v. Johnson*, 2022-Ohio-4629.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29475 |
| | : | |
| v. | : | Trial Court Case No. 2021-CR-4001 |
| | : | |
| MICHAEL VINCENT JOHNSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of December, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ANTHONY J. RICHARDSON, II, Atty. Reg. No. 0097200, P.O. Box 468, Perrysburg, Ohio 43552
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Michael Vincent Johnson, appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of single counts of discharge of a firearm on or near a prohibited premises, felonious assault with a firearm specification, and having weapons while under disability. In support of his appeal, Johnson claims that his convictions for discharge of a firearm on or near a prohibited premises and felonious assault violated his double jeopardy protections in that they should have been merged as allied offenses of similar import at sentencing. Johnson also contends that the State engaged in prosecutorial misconduct by questioning a lay witness as though he were a firearms expert and by making misleading statements at closing argument regarding what elements the State had to prove in order for the jury to find him guilty of discharge of a firearm on or near a prohibited premises. In addition, Johnson contends that the trial court erred by imposing consecutive, mandatory prison terms at sentencing. Lastly, Johnson argues that all of his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. For the reasons outlined below, we disagree with all of Johnson's claims and will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On December 16, 2021, a Montgomery County grand jury returned an indictment charging Johnson with single counts of discharge of a firearm on or near a

prohibited premises in violation of R.C. 2923.162(A)(3), felonious assault with a deadly weapon in violation of R.C. 2903.11(A)(2), and having weapons while under disability in violation of R.C. 2923.13(A)(3). The count for discharge of a firearm on or near a prohibited premises was charged as a second-degree felony under R.C. 2923.162(C)(3) because it was alleged that the offense had caused physical harm to any person. The count for felonious assault was also charged as a second-degree felony, and it included a three-year firearm specification under R.C. 2941.145. The count for having weapons while under disability was charged as a third-degree felony; it was based on the allegation that Johnson had possessed a firearm while having a prior felony drug conviction.

{¶ 3} Johnson pled not guilty to all the indicted charges and the matter proceeded to a jury trial. At trial, the State called several witnesses to testify, including Daniel Timberman. Timberman testified that he is employed as a truckdriver and travels through the Dayton area once or twice a week. On the evening of December 6, 2021, Timberman was driving his truck in the center lane of U.S. 35 West in Dayton when he noticed a blue sedan weaving back and forth on the road with its hazard lights on. Timberman testified that a grey SUV was behind the blue sedan, and he initially thought the blue sedan was a disabled vehicle that the SUV was following. However, Timberman eventually noticed that every time the SUV would try to change lanes, the blue sedan would block it from doing so. While he was driving behind the vehicles, Timberman saw the driver of the blue sedan suddenly hit his brakes and come to a complete stop, which caused the SUV to rear-end the blue sedan. When this happened, Timberman stopped his truck 15 feet behind the vehicles in the middle of the highway. Timberman testified

that while he was stopped behind the two vehicles, he observed the driver of the blue sedan exit his vehicle and fire two or three gunshots at the SUV while the SUV tried to back up and leave.

{¶ 4} When describing the incident, Timberman testified that he did not actually see a firearm, but that he did see something in the driver's hand that had a "flash coming out right in front of [it]." Trial Tr. p. 139. Timberman also testified that he had "hunted [his] whole life" and "target shoot[s] multiple calibers, long guns, handguns, just about everything[,]" and based on his experience with firearms, he had no doubt that the driver of the blue sedan had fired gunshots. *Id.* at 138. More specifically, Timberman testified that he knew they were gunshots based on the flashes he saw, the noises he heard, and the way he saw the driver's hand jump up.

{¶ 5} Timberman further testified that his truck was equipped with a recording system that captured the incident on video. The video from Timberman's truck was admitted into evidence as State's Exhibit 1, and it showed the events testified to by Timberman. Specifically, the driver of the blue sedan can be seen on the video exiting his vehicle in the middle lane of the highway, walking toward the SUV, and pointing his arm toward the SUV as the SUV attempted to back away. While the driver is pointing his arm at the SUV, two gunshots can be heard on the video as well. While neither a firearm nor flashes can be seen on the video, Timberman confirmed that at the time of the incident, he saw flashes that were not picked up by the recording system.

{¶ 6} Timberman testified that, after witnessing the shooting, he called 911 and reported the incident, he met with the police later that evening and provided a written

statement. Timberman also testified that he advised the police about his truck's recording system and confirmed that the video recording of the shooting was turned over to the police.

{¶ 7} Kimberly Helton, a passenger of the SUV involved in the incident, also testified at trial. Helton testified that on the evening in question, her boyfriend, Michael Lake, was driving her in her mother's SUV to take boxes to a storage unit. Helton testified that as they were getting onto U.S. 35 from Smithville Road, she noticed a blue vehicle "driving crazy" behind them. Trial Tr. p. 219. Helton recognized the blue vehicle and knew that it belonged to Michael Johnson. Helton testified that she had dated Johnson for two or three months and had broken up with him a week before the shooting incident. Helton testified that when the blue vehicle got close enough, she was able to see that Johnson was the driver. Helton indicated that she was scared upon seeing that Johnson was the driver because Johnson had told her that he would hurt anyone that she "messed or got with." *Id.* at 231. More specifically, Helton explained that she did not know if Johnson was going to try to stop their vehicle and "get into it" with Lake. *Id.*

{¶ 8} Continuing, Helton testified that Johnson called her on the phone while they were driving and yelled something she could not understand. Helton testified that Johnson then drove his vehicle beside them and swerved at them. Thereafter, Helton claimed that Johnson drove in front of them and "brake checked them[,]" which caused them to hit the back of Johnson's vehicle. *Id.* at 222. After the collision, Helton saw Johnson get out of his vehicle on the highway; Helton was scared and told Lake to go because she did not know what Johnson was going to do. Helton testified that Lake

could not immediately drive away because traffic was heavy and vehicles were "flying on both sides of [them]." *Id.* However, Helton testified that Lake was eventually able to drive away to the exit ramp at Steve Whalen Boulevard.

{¶ 9} Helton testified that as they were getting off the exit ramp, Lake told her that he had been shot. Helton then noticed that Lake had a bullet hole in his lower right arm, an injury which Helton confirmed Lake had not had prior to their altercation with Johnson. Helton testified that she never saw or heard a firearm and that she did not know Lake had been shot until he mentioned it to her. Helton suggested that she did not hear a firearm due to all the traffic and due to her being scared and screaming at Lake to "go go go." *Id.* at 223, 232.

{¶ 10} Helton testified that Johnson continued to follow them in his vehicle after they got off the highway and that he hit them from behind while they were on the Steve Whalen exit ramp. This second collision caused their vehicle to hit two or three trees off the roadway. After hitting the trees, Helton testified that she looked to her right and saw Johnson standing outside of his vehicle walking toward them. Helton testified that Lake was then able to start the SUV and drove away to a Dollar General store on Linden Avenue.

{¶ 11} Helton testified that when they got to the Dollar General store, she called her ex-boyfriend, Nathan Rader, and asked him to take her and Lake to the hospital because Lake had been shot. Rader testified at trial and confirmed that Helton had called him on the evening in question. Rader testified that Helton was crying and panicked during the call and that she had asked him to take her and Lake to the hospital

because Michael Johnson had shot Lake on the highway. Rader also testified that he picked up Helton and Lake at the Dollar General store and took them to Miami Valley Hospital; when he picked them up, he saw that Lake had a wounded, bloody right arm.

{¶ 12} Cathline Layba, the physician who examined Lake at Miami Valley Hospital, testified that Lake presented with a penetrating wound that was consistent with a gunshot wound to the right forearm. Layba testified that Lake had told hospital staff that he was shot in the arm by his girlfriend's ex-boyfriend and that the ex-boyfriend had chased and rear-ended them on the highway before firing shots at their vehicle. Layba confirmed that a bullet fragment was removed from Lake's arm and that the bullet fragment was provided to law enforcement. The bullet fragment was admitted into evidence as State's Exhibit 38.

{¶ 13} Several investigating police officers also testified at trial and confirmed that no shell casings or firearms had been recovered from the area where the shooting had occurred. The State also presented evidence establishing that Johnson called 911 from a Sunoco gas station shortly after the shooting. The recording of the 911 call was admitted into evidence as State's Exhibit 5. On the recording, Johnson can be heard reporting that an SUV hit his blue Hyundai Sonata multiple times on U.S. 35 West and then again on the Steve Whalen Boulevard exit ramp. The officers who responded to the 911 call searched Johnson, his vehicle, the vehicle of a female who was helping Johnson at the scene, and the area around the Sunoco gas station where Johnson was located. The search did not yield any firearms, shell casings, or ammunition.

{¶ 14} Johnson was thereafter interviewed by a detective at the Dayton Police

Department Safety Building. The interview was recorded and a portion of the interview was admitted into evidence as State's Exhibit 37. During the interview, Johnson told the detective that he had chased the SUV after it hit him but claimed that he had never exited his vehicle on U.S. 35. However, after the detective told Johnson that a video recording of the incident was taken by a truck, Johnson changed his story; he admitted to getting out of his vehicle on U.S. 35 but denied firing any gunshots.

{¶ 15} For purposes of the charge for having weapons while under disability, the State presented a judgment entry establishing that Lake had a prior felony drug conviction. The judgment entry was admitted as State's Exhibit 34 and it established that in 1998, Johnson had been convicted in Hamilton County for preparation of marijuana for sale, a fourth-degree felony.

{¶ 16} After considering the testimony and evidence presented at trial, the jury found Johnson guilty of all the indicted charges and the firearm specification. At sentencing, the trial court imposed four years in prison for discharge of a firearm on or near a prohibited premises, four years for felonious assault, three years for the attendant firearm specification, and three years for having weapons while under disability. The trial court ordered the prison terms for discharge of a firearm, felonious assault, and the firearm specification to run consecutively to each other and ordered the prison term for having weapons while under disability to run concurrently with the other prison terms. The trial court also advised that Johnson's prison time was mandatory due to his having prior federal convictions that were the equivalent of first- or second-degree felonies in Ohio. Therefore, in accordance with the Reagan Tokes Act, Johnson received an

aggregate mandatory minimum term of 11 years in prison to a maximum term of 13 years in prison.

{¶ 17} Johnson now appeals from his conviction, raising six assignments of error for review.

### First and Second Assignments of Error

{¶ 18} Because they are interrelated, we will address Johnson's first and second assignments of error together. Under his first assignment of error, Johnson contends that his double jeopardy protections under the United States and Ohio Constitutions were violated because he received separate punishments for discharge a firearm on or near a prohibited premises and felonious assault. Johnson claims this violated his double jeopardy protections because those offenses were based on the same alleged conduct, i.e., shooting Lake on the highway. Under his second assignment of error, Johnson contends that the aforementioned offenses were allied offenses of similar import that the trial court should have merged at sentencing. We disagree with both of Johnson's claims.

{¶ 19} "The Double Jeopardy Clause of the United States Constitution declares that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb[.]' " *State v. Somerset*, 2d Dist. Montgomery No. 29249, 2022-Ohio-2170, ¶ 28. "[S]imilarly, Article I, Section 10 of the Ohio Constitution provides that '[n]o person shall be twice put in jeopardy for the same offense.' " *Id.* The protections afforded by these two clauses are coextensive. *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780

N.E.2d 250, ¶ 7.

{¶ 20} In practice, "[t]he Double Jeopardy Clause protects against three abuses: (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.' " *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). In this case, it is the third protection—multiple punishments for same offense—that is at issue.

{¶ 21} In Ohio, the double jeopardy protection against multiple punishments for the same offense is codified in R.C. 2941.25. *Ruff* at ¶ 12; *In re A.G.*, 148 Ohio St.3d 118, 2016-Ohio-3306, 69 N.E.3d 646. Therefore, when considering this issue, the Supreme Court of Ohio has explained that Ohio courts must look to that statute. *Ruff* at ¶ 11. R.C. 2941.25 provides the following:

    (A)    Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

    (B)    Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may

contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25

{¶ 22} " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions * * *: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *Ruff* at ¶ 31. " 'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *Id.* An appellate court applies a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 23} Offenses are dissimilar in import within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892 at ¶ 23. Therefore, "offenses may be of dissimilar import or significance when (1) they involve different victims, (2) they are not alike in their resulting harm, or (3) a defendant's conduct places more than one person at risk." *State v. Coleman*, 2d Dist. Montgomery No. 28676, 2021-Ohio-968, ¶ 26, citing *State v. Williams*, 2d Dist. Montgomery No. 27663, 2018-Ohio-1647.

{¶ 24} In *State v. Carzelle*, 8th Dist. Cuyahoga No. 105425, 2018-Ohio-92, the Eighth District Court of Appeals analyzed whether a defendant's convictions for felonious

assault and discharge of a firearm on or near prohibited premises merged pursuant to R.C. 2941.25. Like the present case, the discharge of a firearm offense in *Carzelle* was based on the defendant's discharging a firearm "upon or over a public road or highway" in violation of R.C. 2923.162(A)(3). The Eighth District held that the convictions for discharge of a firearm and felonious assault did not merge because "[t]he resulting harm of Carzelle's felonious assault was the gunshot to [the victim's] face" while "[t]he resulting harm [of the defendant discharging a firearm upon or over a public road or highway] was to the public." *Id*. at ¶ 10. *Accord State v. Copeland*, 8th Dist. Cuyahoga No. 106988, 2019-Ohio-1370, ¶ 63. The court explained that the public was the victim " '[b]ecause the offense of discharging a firearm over a public road or highway is a strict liability offense[.]' " *Carzelle* at ¶ 10, quoting *State v. James*, 2015-Ohio-4987, 53 N.E.3d 770, ¶ 34 (8th Dist.).

{¶ 25} In *Williams*, 2d Dist. Montgomery No. 27663, 2018-Ohio-1647, this court cited the holding in *Carzelle* and found that a conviction for discharge of a firearm on or near a prohibited premises in violation of R.C. 2923.162(A)(3) did not merge with a conviction for murder as a proximate result of committing felonious assault. *Id.* at ¶ 24. In so holding, this court explained that " 'R.C. 2923.162(A)(3) is a statute intended to benefit the public good' " and that " '[t]he victim of the offense of discharging a firearm upon or over a public road or highway is the public.' " *Id.*, quoting *James* at ¶ 33. Although the defendant in *Williams* actually shot and killed the victim, we explained that the defendant's "act of firing a handgun across the roadway itself violated [R.C. 2923.162(A)(3)], placed numerous people at risk, and harmed the public at large" while

"his murder conviction required harm to a particular victim and differed in the significance and the nature of the harm it addressed." *Id.* Because of this, we found that the trial court did not err in failing to merge those offenses at sentencing. *Id.*

{¶ 26} "This court has followed *Williams* on several occasions, finding that discharging a firearm on or near a prohibited premises does not merge with murder or other offenses because the offenses are of dissimilar import or significance." *Coleman,* 2d Dist. Montgomery No. 28676, 2021-Ohio-968, at ¶ 27, citing *State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920; *In re T.P.-A.*, 2d Dist. Montgomery No. 28196, 2019-Ohio-2038, ¶ 17-18; *State v. Ropp*, 2d Dist. Champaign No. 2018-CA-44, 2020-Ohio-824, ¶ 26.

{¶ 27} Based on the foregoing case precedent, we find that the trial court in this case properly decided not to merge Johnson's convictions for discharge of a firearm on or near a prohibited premises and felonious assault. Those offenses were dissimilar in import and significance in that the nature of the harm addressed by each offense was different. The harm that flowed from Johnson's committing the felonious assault was the gunshot wound suffered by Lake. In contrast, the harm that flowed from Johnson's committing discharge of a firearm on or near a prohibited premises included not only Lake's gunshot wound, but also Johnson's placing numerous people at risk of injury on U.S. 35. That is, Johnson's conduct of firing gunshots at a vehicle in the middle of a busy highway harmed the public at large and was dissimilar in import and significance from a felonious assault against a particular victim. Therefore, because Johnson's conduct put more than one individual at risk, it supported multiple convictions. *See Ruff*

at ¶ 23.

{¶ 28} We note that our analysis does not change even though Johnson's discharge of a firearm offense was elevated to a second-degree felony due to Johnson's causing physical harm to Lake. *See* R.C. 2923.162(C)(3). In *Williams,* we recognized that the defendant's "act of shooting [the victim] elevated the degree of the offense of discharging a firearm on or near prohibited premises to a first-degree felony [per R.C. 2923.162(C)(4),]" but nevertheless found that "the fact remains * * * that the act of discharging a firearm over a public road or highway itself constituted a violation of [R.C. 2923.162(A)(3)]." *Williams,* 2d Dist. Montgomery No. 27663, 2018-Ohio-1647, at ¶ 24, fn. 4. Also, the Tenth District Court of Appeals explained in *State v. Johnson*, 10th Dist. Franklin No. 18AP-889, 2019-Ohio-4265 that: "Though we are mindful that [the defendant's] act of shooting [the victim] elevated the degree of the offense of discharging a firearm on or near a prohibited premises to a first-degree felony pursuant to R.C. 2923.162(C)(4), we nonetheless still find the offense of discharge of a firearm on or near prohibited premises, under these specific facts, to cause separate and distinct harm to the public." *Id.* at ¶ 19.

{¶ 29} For all the foregoing reasons, we find that Johnson's double jeopardy claim lacks merit and that the trial court did not err by failing to merge Johnson's convictions for discharge of a firearm on or near a prohibited premises and felonious assault.

{¶ 30} Johnson's first and second assignments of error are overruled.


**Third Assignment of Error**

{¶ 31} Under his third assignment of error, Johnson contends that the State engaged in prosecutorial misconduct in two respects: (1) by improperly questioning a lay witness as though the witness was a firearms expert; and (2) by making misleading statements at closing argument regarding what elements the State had to prove in order for the jury to find Johnson guilty of discharge of a firearm on or near a prohibited premises. With regard to the second allegation, Johnson specifically takes issue with the State's omission of the element of "physical harm to any person," which had to be proven under the second-degree felony enhancement provision set forth in R.C. 2923.162(C)(3).

{¶ 32} " 'The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected any substantial right of the accused.' " *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "However, the touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Id.,* citing *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). " 'In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial,' and if 'it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed.' " *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21, quoting *State v. Wilson*, 2d Dist. Montgomery No. 20910, 2005-Ohio-6666, ¶ 10.

{¶ 33} We note that Johnson's trial counsel did not object to any of the alleged

instances of prosecutorial misconduct that Johnson now challenges on appeal. "Failure to object to prosecutorial misconduct at trial waives all but plain error." (Citation omitted.) *State v. Phifer*, 2d Dist. Clark No. 2020-CA-13, 2021-Ohio-521, ¶ 34. To prevail under the plain error standard, Johnson must demonstrate that there was an obvious error in the proceedings and that but for the error, the outcome of his trial would have been different. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 34} Johnson's first claim of prosecutorial misconduct concerns testimony given by Timberman—the truckdriver who witnessed the shooting incident on U.S. 35. As previously discussed, Timberman testified that he did not actually see a firearm but "could see something in [Johnson's] hand and see a flash coming out right in front of that[.]" Trial Tr. p. 139. Timberman then testified that he had "hunted his entire life" and "target shoot[s] pretty regularly" with "multiple calibers, long guns, handguns, just about everything." *Id.* at 137-138. Timberman also testified that, based on his experience with firearms, the flashes he saw, the noises he heard, and the way Johnson's hand jumped up, he had no doubt that Johnson had fired gunshots. The foregoing testimony then led to the following discussion on redirect examination:

State:      Now tell us. You said that you have extensive experience with firearms; is that right?

Timberman:  Yes.

State: And have you ever owned handguns?

Timberman: Yes.

State: Okay. And when you saw what you saw on December 6th, 2021, did you suspect, based on your own experience with firearms, what type of firearm it was?

Timberman: Yeah, to me it seemed like it was medium to small caliber handgun—

State: Okay.

Timberman: –from the sound and such.

State: Okay. So tell us about that. From the sound and what else?

Timberman: The way the gun recoils, yes.

State: All right. So explain to me about that. What do you mean? * * * What recoil? What made you think that anything recoiled?

Timberman: Like if you have a compact handgun, it's not as balanced so you have to really, really hold onto it or else your wrist will jump. If you have a full frame handgun such as like a 1911 or something like that, it has more weight at the front and it's more balanced so it doesn't jump as much.

State: So to dumb it down a little bit, the longer the barrel.

Timberman: For the most part. Yes, the longer the barrel, the better the balance is on the weapon.

State:  So the shorter the barrel.

Timberman: You have the same projectile, same explosion coming out of a much smaller barrel and all that explosive from the power igniting and everything else. That gas has to go somewhere; it doesn't all force it out. Some of it the shorter the barrel, by the time the projectile leaves the barrel there's still some gas left and that's what causes that.

State:  The—causes what?

Timberman: Causes your—

State:  Because your doing—sorry.

Timberman: —recoil—

State:  We're—

Timberman: –and your hand to jump more.

State:  Okay. So you're talking about the hand jump.

Timberman: Yes.

State:  All right. I have nothing further, your Honor.

Trial Tr. p. 148-150.

**{¶ 35}** Based on the foregoing discussion, Johnson contends that the State improperly elicited expert testimony about firearms from Timberman, a lay witness, and wrongfully used that testimony to enhance Timberman's credibility. We disagree and find that Timberman's testimony was proper lay witness opinion testimony.

**{¶ 36}** Evid.R. 701 provides that opinion testimony by a lay witnesses "is limited to

those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Because "[p]erception connotes sense: visual, auditory, olfactory, etc. * * *[,] opinion testimony under Evid.R. 701 must be based on firsthand, sensory based knowledge." *Sec. Natl. Bank & Trust Co. v. Reynolds*, 2d Dist. Greene No. 2007-CA-66, 2008-Ohio-4145, ¶ 17.

{¶ 37} The trial court has "considerable discretion in admitting the opinion testimony of lay witnesses." (Citation omitted.) *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 43 (2d Dist.). However, "[t]he line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always easy to draw." *Hetzer-Young v. Elano Corp.*, 2016-Ohio-3356, 66 N.E.3d 234, ¶ 43 (2d Dist.), citing *Reynolds* at ¶ 19. The Supreme Court of Ohio has recognized "that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *State v. McKee*, 91 Ohio St.3d 292, 296, 744 N.E.2d 737 (2001). *Accord State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 107 (2d Dist.). "Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience." (Footnote omitted.) *McKee* at 297.

{¶ 38} In *State v. Deaton*, 2d Dist. Montgomery No. 27181, 2017-Ohio-7094, this court held that irrespective of whether a police officer was qualified to testify as an expert regarding the operation of a revolver, the officer's testimony established that he had sufficient familiarity with firearms to offer his opinion on that subject. *Id.* at ¶ 19. Specifically, the officer testified that he was "a firearms instructor for pistols" which included "semi-automatic pistols, revolvers, shotguns, patrol rifle[s], and submachine guns[.]" *Id.* We found this demonstrated that, "expert witness or not, [the officer] had sufficient personal knowledge and experience to testify regarding the operation of a revolver." *Id.*

{¶ 39} The present case is analogous to *Deaton*. Here, Timberman's testimony established that he was an experienced hunter and target shooter. Based on his personal knowledge of firearms and his observations of the shooting, Timberman testified that he believed Johnson had fired a "medium to small caliber handgun." Trial Tr. p. 148. In reaching this opinion, Timberman used his knowledge of how a handgun recoils in conjunction with how much he saw Johnson's hand jump. We find that this opinion testimony was well within Timberman's knowledge and personal experience and was helpful in explaining what he saw on the evening question. Accordingly, the testimony at issue was proper lay witness opinion testimony.

{¶ 40} Even if Timberman's testimony had been improper, Johnson cannot demonstrate that the outcome of his trial would have been different had the State not elicited it, because the alleged improper testimony concerned the size of the firearm used during the shooting, a fact which had no bearing on whether Johnson had committed the

offenses in question. Therefore, we fail to see how the testimony prejudiced Johnson. Accordingly, Johnson's first claim of prosecutorial misconduct lacks merit.

{¶ 41} For his second claim of prosecutorial misconduct, Johnson argues that the State improperly misled the jury during closing argument when it made statements indicating that the jury only had to find that he had discharged a firearm on a public road or highway in order to find him guilty of discharge of a firearm on or near a prohibited premises. As previously noted, Johnson specifically takes issue with the State's omission of the element of "physical harm to any person," which had to be proven under the second-degree felony enhancement provision under R.C. 2923.162(C)(3). Indeed, where the existence of an additional fact is required to be proven that affects the degree of the offense and not just the punishment available upon conviction, it is an essential element of the offense. *State v. Gwen*, 134 Ohio St.3d 284, 2012-Ohio-5046, 982 N.E.2d 626, ¶ 11; *State v. Winters*, 2d Dist. Montgomery No. 29157, 2022-Ohio-2061, ¶ 15.

{¶ 42} In this case, Johnson correctly asserts that the State's closing argument omitted the element of "physical harm to any person" for purposes of the second-degree-felony enhancement. The State did, however, properly set forth the elements of discharge of a firearm on or near a prohibited premises under R.C. 2923.162(A)(3), i.e., that one must discharge a firearm upon or over a public road or highway. Therefore, the State's comment during closing argument was not necessarily incorrect, but incomplete in that it failed to mention the physical-harm element required for the second-degree-felony enhancement.

{¶ 43} Despite this omission, Johnson cannot establish that the State's omission of the physical-harm element affected the outcome of his trial, because the trial court gave both oral and written jury instructions that properly advised the jury of the enhancement provision at issue. Specifically, the trial court advised the jury that if it found Johnson "guilty of Discharge of a Firearm On or Near Prohibited Premises on Count One, you will separately decide whether the State proved beyond a reasonable doubt that the discharging of the firearm on or near prohibited premises caused physical harm to any person." Court Ex. I, p. 5; Trial Tr. p. 374. The jury also received a separate verdict form on that issue. Court Ex. II. Accordingly, Johnson's second claim of prosecutorial misconduct lacks merit as Johnson cannot establish that he was prejudiced by the State's failure to reference the physical-harm element during its closing argument.

{¶ 44} Johnson's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 45} Under his fourth assignment of error, Johnson contends that the trial court erred by imposing consecutive prison sentences. Specifically, Johnson claims that the consecutive-sentence findings made by the trial court under R.C. 2929.14(C)(4) were unsupported by the record. We disagree.

{¶ 46} When reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 7. Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if

it clearly and convincingly finds either: (1) the record does not support the sentencing court's findings under certain enumerated statutes (including R.C. 2929.14(C)(4), which concerns the imposition of consecutive sentences); or (2) the sentence is otherwise contrary to law. *Id.* at ¶ 9, citing R.C. 2953.08(G)(2).

**{¶ 47}** Under R.C. 2929.14(C)(4), a trial court may impose consecutive sentences if it finds that (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following three findings are satisfied:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 48} "[A] trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. "[W]here a trial court properly makes the findings mandated by R.C. 2929.14(C)(4), an appellate court may not reverse the trial court's imposition of consecutive sentences unless it first clearly and convincingly finds that the record does not support the trial court's findings." *State v. Withrow*, 2016-Ohio-2884, 64 N.E.3d 553, ¶ 38 (2d Dist.); *State v. Swaney*, 2d Dist. Clark No. 2022-CA-20, 2022-Ohio-3578, ¶ 17. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29. In other words, "the consecutive nature of the trial court's sentencing should stand unless the record overwhelmingly supports a contrary result." (Citation omitted.) *Withrow* at ¶ 39.

{¶ 49} In this case, the record establishes that the trial court made all the required findings under R.C. 2929.14(C)(4) and incorporated those findings into the corresponding sentencing entry. Specifically, the trial court found that: (1) consecutive sentences were necessary to protect the public from future crime or to punish Johnson; (2) consecutive sentences were not disproportionate to the seriousness of Johnson's conduct and to the danger he poses to the public; and (3) that Johnson's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future

crime.   Sentencing Tr. p. 397; Dkt. No. 62.[1]

{¶ 50} Johnson, however, argues that the record does not support the trial court's finding that consecutive sentences are not disproportionate to the seriousness of his conduct.   Johnson claims that this finding is unsupported by the record because the only harm that can be attributed to his alleged conduct is a non-life-threatening gunshot wound to Lake's arm.   We disagree.   As previously discussed, when Johnson fired gunshots in the middle of a busy highway he put many lives in danger and harmed the public at large. Therefore, the severity of his conduct included more than a non-life-threatening gunshot wound to Lake.   In any event, inflicting a gunshot wound to another person is by itself a serious offense that should not be taken lightly.   Accordingly, we do not clearly and convincingly find that the record is devoid of evidence supporting the trial court's finding that consecutive sentences were not disproportionate to the seriousness of Johnson's conduct.

{¶ 51} Johnson also argues that the record does not support the trial court's finding

---

[1] In the judgment entry, the trial court included an additional finding under R.C. 2929.14(C)(4)(b), i.e., that: "At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."   The record, however, establishes that the trial court did not make this finding at the sentencing hearing.   Because the findings under R.C. 2929.14(C)(4) must be made at the sentencing hearing, we will not address the trial court's additional finding in the judgment entry.   Instead, we will only address the findings that the trial court both made at the sentencing hearing and included in the sentencing entry, i.e., that: (1) consecutive sentences were necessary to protect the public from future crime or to punish Johnson; (2) consecutive sentences were not disproportionate to the seriousness of Johnson's conduct and to the danger he poses to the public; and (3) that Johnson's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime.

that his history of criminal conduct demonstrates that consecutive sentences were necessary to protect the public from future crime by him. Johnson claims that this finding was unsupported by the record because he had no history of committing violent crimes and because his criminal record only consisted of drug charges.

{¶ 52} A review of Johnson's presentence investigation report ("PSI") reveals that between 1997 and 2013, he acquired several misdemeanor convictions in Hamilton County, including but not limited to three convictions for possession of drugs, two convictions for drug abuse, two convictions for disorderly conduct, and one conviction for falsification. The PSI also establishes that Johnson acquired felony convictions in Hamilton County for possession of cocaine in 1997, preparation of marijuana in 1998, and possession of heroin in 2000. Thereafter, in 2003, Johnson was convicted in the United States District Court for the Eastern District of Kentucky for one count of conspiracy to possess with intent to distribute heroin and one count of aiding and abetting the use of a firearm in furtherance of drug trafficking. Then, in 2016, Johnson was convicted in the same federal court for conspiracy to distribute 100 grams of heroin or more.

{¶ 53} The information in the PSI established that Johnson had a lengthy criminal record. While most of Johnson's offenses were non-violent drug offenses, the fact remains that for the past three decades, Johnson has continued to engage in criminal behavior—behavior that involves drug trafficking and, more recently, firearms. Therefore, we do not clearly and convincingly find that the record is devoid of evidence supporting the trial court's finding that Johnson's history of criminal conduct demonstrated

that consecutive sentences were necessary to protect the public from future crime by him.

**{¶ 54}** Because the record establishes that the trial court made all the required consecutive-sentence findings, and because the record is not devoid of evidence to support those findings, we must uphold the trial court's imposition of consecutive sentences.

**{¶ 55}** Johnson's fourth assignment of error is overruled.

**Fifth Assignment of Error**

**{¶ 56}** Under his fifth assignment of error, Johnson contends that the trial court improperly imposed mandatory prison time for his second-degree felony counts of discharge of a firearm on or a near a prohibited premises and felonious assault. We disagree.

**{¶ 57}** Pursuant to R.C. 2929.13(F)(6), a mandatory prison term is required for an offense that is a first or second-degree felony when the defendant has a prior conviction for a first or second-degree felony. *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 10. In this case, based on the PSI, the trial court found that Johnson had prior federal convictions for conspiracy to distribute 100 grams of heroin or more, a "Grade A" federal offense; conspiracy to possess with Intent to distribute heroin, a "Grade B" federal offense; and aiding and abetting use of firearm in furtherance of drug trafficking crime, a "Grade A" federal offense. Judgment Entry; Sentencing Tr. (Apr. 26, 2022), p. 394. The trial court determined that these prior federal offenses were the equivalent of first or second-degree felonies in Ohio and therefore ordered Johnson's prison time to be

mandatory.

{¶ 58} Johnson argues that in order for the trial court to properly impose mandatory prison time in such a manner, the record had to include certified copies of the judgment entries for the prior federal convictions on which the mandatory prison time was based. Because the record in this case does not include such documentation, Johnson maintains that there was insufficient evidence for the trial court to impose the mandatory prison time at issue.

{¶ 59} In support of his argument, Johnson cites R.C. 2945.75(B)(1), which provides that: "(B)(1) Whenever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction." Johnson's reliance on this statutory provision is misplaced because "R.C. 2945.75 is not a sentencing statute." *State v. Grooms,* 9th Dist. Summit No. 25819, 2011-Ohio-6062, ¶ 11. *Accord State v. Henson,* 6th Dist. Erie No. E-11-068, 2012-Ohio-3730, ¶ 16. "Chapter 2945 of the Revised Code governs trials, not penalties, sentences, or other sanctions." *Grooms* at ¶ 11. Penalties and sentencing are instead governed by Chapter 2929 of the Revised Code. *Id.*

{¶ 60} In addition, R.C. 2945.75(B)(1) "governs the introduction of prior convictions *as an element of an offense.*" (Emphasis added.) *State v. Werfel*, 11th Dist. Lake Nos. 2002-L-101, 2002-L-102, 2003-Ohio-6958, ¶ 40. *See also Gwen*, 134 Ohio St.3d 284, 2012-Ohio-5046, 982 N.E.2d 626, at ¶ 11-14. "Where * * * the prior offense affects only the penalty, it is not an essential element of the subsequent offense, but strictly a

sentencing consideration for the court." (Citation omitted.) *State v. Allen*, 29 Ohio St.3d 53, 55, 506 N.E.2d 199 (1987). In contrast, "[w]hen the existence of a prior conviction affects the degree of the offense and not just the punishment available upon conviction, it is an essential element of the offense." *Gwen* at ¶ 11.

{¶ 61} In this case, Johnson's prior federal convictions were not used to establish an element of his second-degree-felony offenses, as the prior convictions did not enhance the degree of his offenses, but simply made the associated prison time mandatory. Therefore, the instant matter concerns a sentencing consideration for which R.C. 2945.75(B)(1) does not apply.

{¶ 62} In *State v. Ward*, 3d Dist. Seneca No. 13-10-11, 2011-Ohio-254, the Third District Court of Appeals reached the same conclusion when it addressed an argument similar to Johnson's and held the following:

> [W]e find no merit to Ward's argument that the State failed to properly prove his prior convictions at sentencing. While R.C. 2945.75(B)(1) provides that "a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction," the section only pertains to when "it is necessary to prove a prior conviction." R.C. 2945.75(B)(1). Here, there was no necessity that Ward's prior convictions be proven as an element of an offense or to statutorily enhance the degree of an offense. The State was offering the prior convictions as pertinent information to the felony sentencing factors

contained in R.C. 2929.12. Furthermore, Ward cites us to no authority finding that a defendant's prior convictions offered at sentencing for purposes of R.C. 2929.12 factors requires sufficient proof of the conviction.

*Id.* at ¶ 43.

{¶ 63} Based on the foregoing, we find that the record did not need to include certified judgment entries memorializing Johnson's prior federal convictions in order for the trial court to sentence Johnson to mandatory prison time under R.C. 2929.13(F)(6). Rather, the trial court's reliance on the information in the PSI was sufficient for it to find that Johnson had three prior federal convictions that amounted to first and/or second-degree felonies. The PSI specifically set forth the type of federal offenses of which Johnson had been convicted, the date of his convictions, the court of conviction, the corresponding case numbers, and the resulting sentences. Pursuant to R.C. 2929.19(B)(1)(a), the trial court was required to consider Johnson's PSI at sentencing; therefore, it was proper for the trial court to rely on the information contained therein when imposing mandatory prison time.

{¶ 64} Johnson's fifth assignment of error is overruled.

**Sixth Assignment of Error**

{¶ 65} Under his sixth assignment of error, Johnson contends that all his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence because the evidence presented at trial failed to establish that he possessed or discharged a firearm on the night in question. We disagree.

{¶ 66} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, 2009 WL 282079, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 67} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61

and 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 68}** As previously discussed, Johnson was convicted for discharge of a firearm on or near a prohibited premises, felonious assault with a deadly weapon, a firearm specification, and having weapons while under disability. To establish discharge of a firearm on or near a prohibited premises, the State had to prove that Johnson discharged a firearm upon or over a public road or highway. R.C. 2923.162(A)(3). To have the offense enhanced to a second-degree felony, the State also had to prove that Johnson caused physical harm to any person. R.C. 2923.162(C)(3). To establish felonious assault with a deadly weapon, the State had to prove that Johnson knowingly caused or attempted to cause physical harm to another by means of a firearm. R.C. 2903.11(A)(2); R.C. 2903.11(E)(1); 2923.11(A), (B)(1). To establish the firearm specification attached to felonious assault, the State had to prove that Johnson had a firearm on or about his person or under his control while committing the felonious assault and that he used the firearm to facilitate the felonious assault. R.C. 2941.145. To establish having weapons while under disability, the State had to prove that Johnson possessed a firearm while having been previously convicted of a felony drug offense. R.C. 2923.13(A)(3).

**{¶ 69}** All the foregoing offenses and the firearm specification required the State to prove that Johnson possessed or discharged a firearm. Johnson argues that there was insufficient evidence to establish that element because: (1) none of the witnesses specifically testified to seeing him with a firearm; (2) a firearm cannot be seen on the video

evidence; and (3) no firearm or shell casings were discovered by law enforcement. We disagree with Johnson's argument.

{¶ 70} On the video evidence taken from Timberman's truck, Johnson can be seen exiting his blue vehicle in the middle of U.S. 35 and then walking toward the SUV containing Lake and Helton while raising and pointing his arm toward the SUV. While Johnson is pointing his arm at the SUV, two gunshots can be heard on the video. Although a firearm cannot be clearly seen in Johnson's hand on the video, Timberman testified that he "could see something in [Johnson's] hand and see [a] flash coming out right in front of that[.]" Trial Tr. p. 139. Timberman explained that based on his extensive hunting and target shooting experience, the flashes he saw, the noises he heard, and the way he saw Johnson's hand jump up, he had no doubt that Johnson had fired gunshots.

{¶ 71} In addition, Helton testified that Johnson was the individual driving the blue vehicle on the evening in question and that shortly after the altercation with Johnson on U.S. 35, Lake told her that he had been shot. Helton also testified to observing a gunshot wound on Lake's right arm—a wound that Helton confirmed Lake did not have until after the altercation with Johnson. Although Helton testified that she never saw or heard a firearm during the incident, her testimony suggested that she did not hear anything due to there being a lot of traffic and due to her being scared and screaming at Lake to "go go go" so that they could quickly get away from Johnson. *Id.* at 223. Helton's testimony in that regard was supported by the video evidence, as the video showed that traffic was heavy and that the SUV was trying to quickly maneuver away from Johnson's vehicle.

{¶ 72} That Johnson discharged a firearm was also supported by Rader's testimony. Rader testified that Helton called him on the night in question and told him that Johnson had shot Lake on the highway. Rader also testified to seeing Lake with a bloodied, wounded arm when he picked up Lake and Helton and took them to the hospital. The medical provider who treated Lake at the hospital also testified that Lake told hospital staff that he had been shot in the arm by Helton's ex-boyfriend. The medical provider also confirmed that Lake's injury was consistent with a gunshot wound to his right forearm and that a bullet fragment was removed from his arm and given to law enforcement.

{¶ 73} When viewed in a light most favorable to the State, we find that the foregoing testimony, the video evidence, and the bullet fragment taken from Lake's arm would permit a rational juror to conclude that Johnson shot Lake on the evening in question. Therefore, contrary to Johnson's claim otherwise, we find that the State presented sufficient evidence to establish that Johnson possessed and discharged a firearm.

{¶ 74} After weighing all the evidence and reasonable inferences, we also find that the jury did not lose its way or create a manifest miscarriage of justice when it relied on the State's evidence to convict Johnson. The jury was free to accept and credit the evidence offered by the State, evidence which did not weigh heavily against Johnson's convictions. Therefore, in addition to being supported by sufficient evidence, we find that Johnson's convictions were not against the manifest weight of the evidence.

{¶ 75} Johnson's sixth assignment of error is overruled.

## Conclusion

{¶ 76} Having overruled all six assignments of error raised by Johnson, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Anthony J. Richardson, II
Hon. Mary Lynn Wiseman